A. PARTRIDGE & CO. *v.* SAMUEL R. STOCKER, EDWARD A. WARDNER, NICANOR KENDALL, RALPH HOWARD AND ADELIA A. HOWARD.

### [IN CHANCERY.]

*Deposition. Motion to Suppress Testimony. Husband and Wife. Assignment.*

A deposition ought not to be suppressed for a failure to comply with the rules in a mere matter of form, unless such failure proceeds from bad faith rather than mere accident and mistake.

Where a party files a motion to suppress testimony, and the adverse party gives notice to bring it on before the hearing in chief, *held*, that it should be so brought on, or that it should not be entertained on the hearing in chief.

H. suffered his wife to set up the millinery business in her own name, and to manage it at her own discretion, he having nothing to do with making the purchases, keeping the accounts, or paying the debts of the business, and having furnished no capital for which he had not been repaid, and having had no communication with those of whom his wife made her purchases. *Held*, that on equity principles the stock and property in the millinery shop must be treated as the separate property of the wife, and be held liable for her debts and subject to the demands affecting it.

*Held* also, that H. has no equity to the goods of his wife on the ground that he had supported her and assisted her occasionally in the millinery business, which will stand against the rights of her creditors.

*Held* further, that H. cannot by assignment of the goods and other property in the millinery shop create a lien on the same in the assignee, who had notice of the manner in which the stock and property had been acquired and in which the business of the shop had been conducted, which will be effectual against her creditors who supplied goods to the shop.

APPEAL from the court of chancery.   The facts in the case sufficiently appear in the opinion of the court.*

*William W. Howard* and *Julius Converse*, for the orators.

*Andrew Tracy*, for the defendant Wardner.

KELLOGG, J.   The proof of the existence of the partnership of the orators at the time when their account against Mrs. Adelia A. Howard, the wife of Ralph Howard, one of the defendants, accrued, rests upon the second deposition of Edson E. Plimpton, one of the orators.  This deposition was filed in the clerk's office on the 26th of August, 1861, and, on the 16th of September following, the defendant Wardner, who is the only defendant who appeared and answered in this cause, filed a motion to suppress the deposition for reasons assigned.   It appears that on the 1st of October following, the solicitor for the orators gave a written notice to the defendant's solicitor to proceed to a hearing on this motion before the final hearing on the merits of the case, so that, in case of the suppression of the deposition, the orators might have an opportunity to retake it before the final hearing.   This motion was not pressed forward by the defendant until the final hearing at the December Term, 1861.   Three of the reasons assigned for the allowance of this motion relate to mere formal irregularities in the taking, signing, and certifying of the deposition; and a deposition ought not to be suppressed for a failure to comply with the rules in a mere matter of form, unless such failure proceeds from bad faith, rather than from accident and mistake.   The only ground upon

* This cause was argued at the general Term of the supreme court, held at Montpelier in November, 1862.   The opinion of the court was delivered at the February Term, Windsor county, 1863.

which such a motion should be allowed is that of preventing injury and advancing justice ; and it is apparent that to suppress testimony for inaccuracies of form merely would lead to neither of these results. The remaining reason assigned for the allowance of this motion is that the witness did not answer certain cross interrogatories proposed by the defendant, but we think that the witness answered with reasonable fulness to all of the cross interrogatories which are specified as being insufficiently answered, and that this objection is not well taken in fact. A motion to suppress testimony is, under ordinary circumstances, addressed wholly to the discretion of the chancellor, and is one of those incidental questions in practice which must rest mainly in discretion. Such questions are ordinarily not revisable even upon chancery appeals, *Lovejoy* v. *Churchill*, 29 Vt. 151. The chancellor having overruled this motion, and, for aught that appears in the case, having done this in the strict and proper exercise of his discretion, we find no occasion to revise his decision. Even if this question could be raised on appeal from his decision, we should be entirely satisfied to hold that a motion to suppress testimony, after a notice from the adverse party to bring it on before the hearing in chief, should be so brought on, or that it should not be entertained on the hearing in chief. We regard the decision of the chancellor overruling this motion as being a very proper application of his discretion to the facts and circumstances of the case. 2 Daniell's Ch. Pr., (Perkins Ed.) 1188 ; *Underhill* v. *Van Cortlandt*, 2 Johns. Ch. R., 345 ; *Skinner* v. *Dayton*, 5 Johns. Ch. R. 191 ; 3 Greenl. Ev., § § 352, 353.

This preliminary question being thus disposed of, the orators' proof of the existence of their partnership during the time when their account against Mrs. Howard accrued becomes full and satisfactory ; for it appears by this deposition that the orators' firm or partnership was formed on the 1st of September, 1859, and was not changed after that time until this account had accrued. Although the first of the written articles of partnership provides that the partnership was to continue for three years from the 14th of January, 1860, yet those articles were made on

the 1st of September, 1859, and recite that the partners had *at that time* contributed distinct sums to the capital stock, and the partnership appears to have had an actual existence from that time.    This fact of the actual existence of the partnership previous to the 14th of January, 1860, should control any apparent ambiguity arising from the provisions of the first article ; but that article in terms refers to the time of the duration or continuance of the partnership and not to the time of its commencement, and, thus construed, it is entirely consistent with the orators' claim that their partnership actually commenced on the 1st of September, 1859.

In the court of chancery the defendant Wardner alone appeared and made defence in this case, and the orator's bill was taken as confessed by each of the other defendants.    Since the suit was removed to this court by appeal, the deaths of William B. Partridge, one of the orators, and of Nicanor Kendall and Mrs. Adelia A. Howard, two of the defendants, have been duly suggested, and the suit is now prosecuted by the surviving orators against the surviving defendants.

The case presented by the orators' bill as a ground for the relief prayed for depends entirely upon the facts which should be treated as established by the testimony.    We have not been able to arrive at entire unanimity of opinion in respect to some of the facts which are controverted, but, in the judgment of a majority of the court, the results of the testimony establish, with reasonable distinctness and certainty, the following facts, viz : Mrs. Adelia A. Howard, the wife of the defendant Ralph Howard, commenced in the fall of 1856, to carry on the millinery business in the village of Windsor in her own name.    Her husband appears to have advised her not to go into this business before she engaged in it, but, by his conduct, if not by his express declarations, he consentd that the business should be commenced, carried on, and managed in her name.    He was engaged in the business and trade of a tailor, and his declarations as well as hers show that it was the understanding between them that the millinery business should be carried on as a separate and distinct

business from his, and that she was not to use or pledge his credit in managing the business. Accordingly, she leased rooms for the purpose of carrying on the business and paid the stipulated rent for the rooms so leased, and when she and her husband were occupying rooms in the same building,—the one for the millinery and the other for the tailoring business,—they each separately paid their respective proportions of the rent. The entire millinery business was conducted in her name and under her personal management. She bought and sold the goods and controlled the business of her shop, and employed the hands at work in it, and settled with and paid them from time to time. She usually went to Boston in the spring and fall of each year to make purchases of goods and stock for her shop, and frequently ordered goods from the parties with whom she dealt in Boston to be forwarded to her by express ; and the goods came invariably in packages marked with or addressed to her name. Money was obtained by her for the purpose of making purchases of goods and stock for her shop when she went to Boston from time to time as above stated, on notes discounted at the bank in the village in which she was carrying on the business ; and these notes were, except in a single case, signed by her as principal, while the name of her husband appears upon only one of them. All of these notes were paid either by her, or out of money which she furnished from the proceeds of the business of her shop. All of the purchases made for her shop were made on her credit, and not upon her husband's ; and, when he and she dealt with traders in the vicinity, separate accounts were kept by such traders with her and with him. He furnished some goods for the millinery shop at different times, and perhaps rendered other assistance to his wife in carrying on her business, but it is quite clear from the testimony that the amount of his contributions or advancements to the millinery shop was not large, and that he was fully repaid for the same by money or other property taken from the shop. She continued to carry on the millinery business from the time of commencing the same as above stated up to some time in January, 1860, when, by reason of her failing

health, she became confined to the house, and was unable to personally superintend the shop. While she was thus carrying on this business, she was accustomed to buy goods for her shop of the orators, who were importers and manufacturers of silk and straw millinery goods in Boston; and, when she first commenced purchasing such goods of the orators, she represented to them that she was doing business by herself, without receiving any help from her husband. For the goods which she purchased of the orators, they gave credit to her only, and not in any manner or part to him. At the time of the commencement of this suit, she was indebted to the orators on account of millinery goods sold and furnished by them to her, previous to the transfer made by her husband to the defendant Wardner, in the sum of $127.25. Many of the goods so furnished by the orators to her were in the millinery shop when the goods in that shop were transferred by her husband to the defendant Wardner. We are irresistibly led to the conclusion that, as between her and her husband, the millinery business should be regarded as entirely separate from his business; and that this was the express understanding between them at the commencement and during the entire continuance of that business. Upon this part of the case, the actions and conduct of Mrs. Howard and her husband are even more convincing and are justly entitled to more influence, than their declarations. He suffered her to set up the business in her own name, and to manage it at her own discretion. He had nothing to do with making the purchases, or keeping the accounts, or paying the debts of the business, and he never had any communication with those of whom she made her purchases, and never discovered any interest in the state of their accounts; and when he had the temporary charge of the millinery shop, in the sickness or absence of his wife, he represented to others that he was taking care of the business for his wife, and that he carried to her all the money which he received in the business of that shop. His actions and conduct can be interpreted only by the fact that he consented to the setting up of this millinery business by his wife as a distinct and separate business from his,

Partridge & Co. *v.* Stocker et al.

and that there was a distinct understanding between them that he was not to have any thing to do with that business.   This view of the facts, if it needed corroboration from his cotemporary declarations, is strongly supported by his declarations as proved by the testimony of Messrs. Stearns, Winn, Ensworth, Kendall and Simonds.   Soon after the commencement of Mrs. Howard's sickness, and early in February, 1860, she sent a message to the orators, through Mr. Kendall, desiring them to secure their claim against her on the goods then remaining in the millinery shop; and, in consequence of this request, they sent forward their account against her to an attorney, who caused the goods to be attached on a writ in favor of the orators against her husband. This attachment appears to have been made without specific instructions from the orators, and solely for the purpose of creating a lien upon the goods.   But this attachment was wholly ineffectual, because the orators were not in a situation to assert any debt against her husband,—the goods which made up their account not having been sold to him nor on his credit.   The debt due to them rested on a sale made to his wife, and a credit exclusively given to her.   So far as this case depends upon the orators' rights against him and his wife, there can be no doubt whatever that the stock and assets of her business should be held applicable to the payment of the debts of that business.   He knew that his wife began this business without capital, and must have known that she was procuring goods on credit.   For the debt due to the orators, they have no remedy against either him or her at law; and, by his acquiescence and consent, they have been placed in a situation in which they can enforce no claim for the debt due to them except against the stock and proceeds of the business.   He allowed this course of dealing; and this is sufficient to prevent him from holding the property against the claims of the creditors of the business.   Even if he was liable at law for the debts of the business, a court of equity would relieve him, at least, to the extent of making the funds in the trade applicable to the payment of the debts.   2 Story's Eq. Jurisp., (Redfield's Ed.,) § 1387, note 3.   In *Richardson, Adm'r.*

v. *Estate of Merrill et al.*, 32 Vt. 27, the right of the wife to her separate property, whether acquired before or during cover-ture, and, in the latter case, whether the acquisition is the result of gift or inheritance, or is the product of her own personal earnings, is distinctly recognized; and REDFIELD, CH. J., in delivering the opinion of the court, says that "in every such case, she will hold against the husband and his heirs, and generally against his creditors, so long as the husband allows the wife to keep the property separate from the general mass of his own estate, although his own name may be used in the formal conduct of the business, unless in the case of creditors this may lead to a false credit on the part of the husband." It appears from the testimony that Mrs. Howard, very soon after the commencement of her sickness, indicated her desire and intention to charge the property belonging to the millinery shop with the payment of the debt due to the orators, and no question is made upon the testimony in respect to this fact. Although she could not bind herself by a personal contract, yet she may conclusively bind her separate property for the payment of her debts, and a court of equity will hold her separate property liable for her debts. 1 Spence Eq. Juris. 595–598; *Taylor* v. *Shelton*, 30 Conn. 122; *Yale* v. *Dederer*, 18 New York 265,—*S. C.*, 22 New York 450; *Owens* v. *Dickinson*, Craig and Ph. 48; 2 Story's Eq. Jurisp., (Redfield's Ed.), §1397, note 2, § 1401, *a*.

The goods and other property in the millinery shop were on the 9th of February, 1860, and within a very few minutes previous to the attachment of the same on the writ of the orators against the defendant Ralph Howard as above stated, delivered by him into the possession of the defendant Wardner to be held as security for his indebtedness to said Wardner upon book account, notes, and otherwise. · This indebtedness appears to have commenced, and wholly to have accrued, after January, 1855, and no inconsiderable part of it accrued before Mrs. Howard commenced the millinery business. Its total amount on the 9th of February, 1860, was $436.09. The defendant Wardner can stand in no more favorable position against the claim of the

orators than that occupied by Mr. Howard, unless he is to be treated as being justified in giving credit to him in reliance on the stock of the millinery shop. During the greater part of the time in which Mrs. Howard carried on this business, her shop or place of business was in the immediate vicinity of the store of the defendant Wardner ; and he admits in his testimony that she superintended the millinery business mostly, so far as he observed it. The occasional acts of her husband in superintending and managing the business in her absence are not sufficient to raise a doubt that, when she was at home, the business was exclusively managed and conducted by her, as much as if she had been a *feme sole*. The defendant Wardner must have known that she had no capital, and the manner in which the business was conducted was such as to put him on inquiry before advancing property on the credit of the goods. If he had made such inquiry, he would have discovered that the goods which came to the shop were in packages marked with her name,—that the entire business of the shop was conducted and managed by her,—that the other merchants in the same village kept accounts with her separate from the accounts kept with her husband,—and that her husband had nothing to do in supplying her shop with goods, or in carrying on its business. Mr. Wardner must be taken to be affected with notice of the manner in which the business of the millinery shop was in fact carried on, because his situation and opportunities for observation were such as to justify the belief that he must have known all about it. We think that, having notice of the manner in which the business of the shop was conducted, he was not justified in giving credit to her husband on account of the stock and property of that shop, and that he has no right to a lien upon that stock and property, derived from the assignment to him by her husband, which can be considered effectual against her creditors who supplied goods to the shop. His claim to such a lien, if valid at all, must be treated as limited to the ultimate profits of the business after the payment of its debts. The asserted equity of the husband to the goods on the ground that she had been supported by him while

she was carrying on the business, and that by his personal assistance and otherwise he had contributed to the carrying on of the business, is not, in our judgment, entitled to stand against the right of her creditors.  It would have been his duty to have supported her, without any reference to the millinery business which she carried on ; and that business does not appear to have been a charge upon his credit or capital to any appreciable extent. The business seems to have been remunerative and profitable while managed by his wife, and we are unable to resist the conviction that he derived benefits from it more than sufficient to satisfy him for all of the contributions in time, expenses, and property which he gave to it.   The defendant Wardner stands in the position of an assignee for the security of a pre-existing debt, with notice of the real character of the business of the millinery shop and of the manner in which its stock and property had been acquired.   He must be treated as holding the property subject to the equities which would attach to it in the hands of Mr. Howard, his assignor ; or as between his assignor and the orators.

On equity principles, therefore, the stock and property in the millinery shop must be treated as the separate property of Mrs. Howard.   It resulted from her credit and her earnings, under the sanction and permission of her husband, and should be held liable for her debts, and subject to the demands affecting it.   The facts which we regard as established by the testimony in the case are in substance alleged in the orators' bill as the ground of their equity and right to relief.   On these facts, the orators are to be regarded in equity as her creditors, and we think that they have a right to have her separate property applied in payment of their debts against her.   Their right as creditors to this application of the stock and property in the shop is not limited to the goods which they furnished, but extends to all of the goods in the shop which were acquired upon her credit and by her earnings, because the entire stock and property was her separate property, and she clearly indicated an intention to charge the whole property with the payment of the debt due to the orators.   We are

not called on to adjust any question of priority between her creditors in the application of her assets to the payment of her debts, because the orators are the only creditors of hers who are before the court.

The decree of the chanceller, *pro forma* dismissing the orators' bill, is reversed, and the cause is to be remanded to the court of chancery with directions to enter a decree in favor of the orators, providing for the application of the stock and property of the milinery shop, or of the proceeds of the same, as the separate property of Mrs. Howard, in satisfaction of the orators' debt against her, and for the taking of such accounts as may for this purpose become necessary, and allowing to the orators, as against the defendants Wardner and Ralph Howard, their costs in the court of chancery and in this court.